Good morning, your honors. Charles Fleischman appearing for the plaintiff and appellant. This is an ERISA case where my client was denied benefits after receiving those benefits for, I think, 14 and a half years. Twelve and a half of those years he received those benefits under the any occupation test of the plan. The decision to terminate his benefits was based, according to the defendant initially and throughout the administrative process, on the fact that his treating doctor, Dr. Towner, sent in a form, a Cigna form called a PAA form, that listed what his limitations were. They were questions that were asked by Cigna of the doctor, and he checked off the boxes that were appropriate. And they were boxes that said that he could walk, sit, and stand, each of those three activities, for between 0 and 2.5 hours in an 8-hour workday. And based upon that form, the defendant made a decision that my client could perform sedentary work. Now, there is no way in the world that a person that cannot sit for at least 6 hours can perform sedentary work, not according to the Department of Labor. But they made that determination. And based upon that determination, they did a vocational study that came out with, I think, three or four jobs that they said he was qualified to perform, both physically and by his education and background. Well, it's the old expression of garbage in and garbage out. If you make the false assumption that he could perform a sedentary job, and that assumption is false, the conclusion that comes from that original assumption is also false. So those jobs don't really mean anything, because he has to be able to perform a sedentary job, and he can't, regardless of how they ever came to the decision. There was some other evidence that the corporation had that called into question Dr. Towner's conclusions. Your client reported that he went to the gym, that he was able to engage in a number of activities. They made numerous efforts to contact him. Couldn't find him because he was traveling. He was in Texas caring for his parents. Your client is very sympathetic because of his affliction. On the other hand, he didn't cooperate particularly well here. And once we get to the district court, district court doesn't know what to do with that, so she authorizes an independent examination and comes up with a conclusion that seems consistent with some of the evidence and obviously inconsistent with the other evidence, which is why she did it. And your client didn't fare well under that. That's why I'm here. That's true. But I don't think the facts support the decision of the district court. True, my client was asked to go to a functional capacity evaluation in 2006, but he never got the notice. He was living with his parents in Texas taking care of them. He wasn't traveling around. As a matter of fact, they had surveillance on him for three days, and they never saw him leave the house in Texas. So he wasn't traveling around. He was living with his parents in Texas, an elderly couple taking care of them. The fact that he went to the gym occasionally, that wasn't mentioned. You're getting on the subject of in 2006 they asked him to have an FCE and say he never got the notice, but the story didn't end there. In fact, there were further efforts to set it up, and it never took place. Well, it didn't take place because the FCE facility in Texas refused to do it without a prescription from Dr. Towner, and Dr. Towner refused to give the prescription. It wasn't that my client didn't want to go. Your client couldn't have told Dr. Towner or couldn't have gotten a different physician to give the approval? That assumes that there's a physician out there that would say that my client, his physical situation would be okay to go through an FCE. When the question came up before the court some years later, I didn't see you articulating a position that puts my client at risk.  I'm not the doctor. I mean, I had the doctor's word for it that said that he'd be at risk if he did it. You have the facility that says we're not going to do it without a doctor's okay. In the end, I'm left with the same impression Judge Bivey articulated, which is your client didn't seem particularly cooperative when the company tried to inquire into the situation. Ultimately, it comes up in front of the court on a de novo standard, so frankly, I'm not sure how all the prior history had much impact, but it does come up to the court under a de novo standard, and the court looks at it, has the additional examination done, and determines that she winds up agreeing with the insurance company. Well, the initial examination is three years after they deny the claim. And the initial – I'm sorry, the FCE examination is three years after they deny the claim. The FCE examiner says this is a snapshot picture of today only. I don't know why. What else was the FCE supposed to do? Well, I agree. It wasn't supposed to do anything else. That's why we both objected to it. Your client was not particularly cooperative in all of this. Neither your client nor his doctor. Well, you know, like under SAFON, the court said that a doctor is not a litigant in the – whatever the words were, is not a litigant in the claim. He's not a lawyer. He's nothing. He's just – he may provide useful information, but he doesn't bind the client. So whether he was cooperative or not, whether he actually believed that it would be harmful to my client, or whether he actually didn't want to sign it because he didn't want to take the responsibility, that's not up to my client. That was the doctor's decision. And the doctor doesn't bind my client. My client never refused to take it at all. My client said, fine, I'll take it. But the facility said, we need your doctor's okay. My client can't coerce his doctor into saying okay. The doctor was uncooperative in other ways as well. And if your client was really interested in seeing this thing through, where he's got some burden of recertifying that he's really disabled under the anti-occupation standard, then he needs to find somebody who will help him establish his case. Well, see, I don't follow that. If the facility says, we're not going to do it unless your doctor says okay, and his doctor says no, my client is supposed to second-guess his doctor and go out and find another doctor that will say yes? Why would he even think of doing that? We get second opinions all the time in our social security cases. We see these kinds of things all the time. But nobody asked him to go out and find another doctor that would say okay. And the insurance company couldn't have sent him to another doctor for a physical examination, and that doctor could have said okay. Why would my client have any question about the honesty and veracity and the medical knowledge of his treating doctor? Why would he even say, gee, if my doctor says it's not okay for me to have this FCE, maybe I shouldn't? Well, because he's in danger of losing his benefits if he didn't come up with some other evidence for them. They never said you're going to lose your benefits if you don't have the FCE. They never gave him the – it was never that draconian a decision before him. Well, the FCC that's ultimately performed is, of course, at the direction of the district court, not at the direction of the insurance company. No. When the insurance company asked him to do an FCE, they never said if you don't go through the FCE. That's right. Well, what they were asking for was some kind of additional information. And your client wasn't forthcoming with other information. There were other things probably short of an FCE. What? They never asked – what else did they ask him for? The only thing they asked him for was an FCE. They just can't say bring us something. They have to tell him what they want. That's Saffron. That's butan. That's a whole line of nine circuit cases. You just can't say – you've got to bring us something without telling what it is. The only thing they asked for was the FCE. The only thing – and they never said if you don't give us the FCE, you lose. You're going to lose everything. But they did tell him that your doctor has to okay it. His doctor says no. What is he supposed to do? He's supposed to say I'll fire my doctor? Why would he do that? Why wouldn't he believe his doctor and say it's detrimental to my health? My doctor told me so. I mean, when the court ordered him to go to the FCE, he went to the FCE. Of course, it was two and a half to three years later. We both objected at that time it's meaningless. The FCE – How is it meaningless? Well, because just what the FCE examiner said. It's a snapshot picture of what he can do today. Not what he could do two and a half years ago and not what he can do tomorrow. But has his condition changed? I mean, your brief affirmatively asserts his condition did not change over the years. Yes, but he's got good days and bad days. I mean, it doesn't matter. And you make that argument to the district court. The district court's not persuaded. And now we get to the focus, why is it we should conclude the district court's determination was clearly erroneous? Okay. First of all, the district court said that there's no reason to disbelieve Mr. Mooney's. Secondly, the – well, the same – he's in the same situation today – I'm sorry. At the time, they terminated his claim as he was at the time they approved his claim. There was no – there's no evidence of any improvement on his behalf. And I think you wrote about that in the Montour decision. If there's no evidence of improvement and all the evidence that they have shows he's in the same condition, you know, what evidence they have to terminate him. They had none. Next, the reason that she discounted Dr. Towner, those reasons don't make any sense. One of them was because he didn't have – he said that my client has wasting, but there's no wasting in his notes. Well, there were notes about wasting. There's also prescription medication that he was given throughout the entire period, this testosterone, which is given specifically for muscle wasting in AIDS patients. Next, she cited to a February 2007 note by Dr. Towner saying, Dr. Towner doesn't mention anything about cognitive problems, fatigue, or wasting. And yet, in that note, he mentions cognitive problems, fatigue, and there's a prescription for the wasting medication. So she was wrong there. It's clear error, relying on that. So when you come down to it, there was no reason to disbelieve Dr. Towner, and he was the only doctor that saw my client. There's no doctor that saw my client. There's only one doctor that reviewed the medical records, Dr. Taylor from the insurance company, and his report, which is completely conclusory, doesn't discuss anything, and there's no doctor that ever examined him for the insurance company. The only thing the judge had was a functional capacity evaluation from two and a half years or three years after the denial of the benefits, which the examiner himself said doesn't really tell you anything. It's only a snapshot of today. I don't know what he's going to be like tomorrow, and because of his medication and his condition and everything else, I don't know what he was like yesterday, let alone two and a half years ago. And that's why Mr. Berner and I both objected to the functional capacity evaluation. Now, I know I said that the judge wanted to appoint an expert, and I said there's authority. You can appoint an expert, and I cited the, I think it's a Ninth Circuit case. I can't remember the case that I cited. It was Weaver, I think. But I had no idea she was talking about a functional capacity evaluator. I thought she was going to send him to or have an HIV doctor review the medical records. And as soon as I found out that she meant a functional capacity evaluator, I joined with Mr. Berner in objecting to it. Also, there's the problem with the second review. There was no doctor that reviewed the second review. They had on the second, he was given a second opportunity to appeal, which is a clear violation of the regulations, the ERISA regulations, which are supposed to guarantee a full and fair review. So we got no reason to discount or to disbelieve Dr. Towner. We got my client doing, in the same condition he was in all the time, the condition which originally warranted his getting the benefits. You've got the defendant relying solely on Dr. Towner's PAA, PPA, whatever it's called, that form, which under no situation, under no circumstances shows that he can perform a sedentary job, which is what their basic decision was based on, their initial decision. There is nothing in this case that supports terminating his benefits. And to terminate his benefits, they had to have substantial evidence. I'd like to reserve the rest of my time, unless there are any questions. If you may. We'll hear from the defendant. Excuse me. Good morning, Your Honors. You may please the Court. My name is Russell Berner, and I'm here representing the defendant in appellee Emmett Construction. I would like to begin with an issue that I believe was somewhat first raised in the reply brief, which he mentioned slightly at the end, but in a different manner, the full and fair review and the requirements of those. In the opening brief in a trial, he had mentioned some issues related to full and fair review. In his reply brief, he cites to a 10-circuit case, Niles v. American Airlines, to suggest that a violation of the full and fair review would be an independent reason to reverse the district court's decision. On that issue alone, I would submit that in Niles' court, first it was simply dicta. It was a throwaway line in the introduction to its legal discussion. And it only relies on a single case, which was a 7th Circuit's opinion. In Hackett, which is 315 F 3rd 771, Hackett does not discuss full and fair review or provide any issue on reversal. I'd like to ask you, perhaps on that connection, the expert submits his report on a Thursday, and on Monday Judge Snyder adopts it. There doesn't seem to be any opportunity for the plaintiff to comment on it. I believe that the plaintiff eventually had the opportunity to address the specific findings in the F.C.E. in the motion for new trial or for unamended order or amended judgment. He did address it at that point. But the independent doctor believed the F.C.E. was there for the court's usage. Judge Snyder believed that she had not had enough information. And under de novo review, she wanted to complete a full and fair review on her end. And she asked for an independent person. Right. So she adopts it instantly. Unfortunately, I don't know what her work ethic is. As I said, I believe that plaintiff's counsel, appellant's counsel did have the opportunity when he filed his motion for new trial or to amend the order and judgment to discuss. And he did at that point. He submitted a declaration from the plaintiff himself. He made comments on the F.C.E. Judge Snyder addressed those issues in denying his motion for new trial. And what about the plaintiff's claim of mental incapacity? The functional capacity exam didn't seem to go to that. That is certainly one of the situations and one of the issues that is somewhat absent in the entire claim. His only, plaintiff's only doctor throughout his treatment was his AIDS physician. However, most of the time he suggested that one of the main reasons he could not work was because of cognitive capacity or lack of cognitive capacity, lack of concentration or fatigue. That was why Connecticut General, the insurer in this matter, constantly asked him basically what do you base that on. You say it, but there's no psychological testing. You haven't referred him to a psychologist. They asked him whether there had been mental state examinations prepared, and that was the whole situation. We attempted to do that, and when that was not available, then they suggested that perhaps a functional capacity evaluation would at least give him an opportunity to see what he could or could not do. But that wouldn't go to the cognitive part, would it? No. I agree with Your Honor. I believe that generally a functional capacity evaluation is going to address his physical issues. But the concept of being fatigued and not being able to concentrate, I believe, would come up in an FCE, because it would have been noted, I believe, by the examiner and through the testing that was done, whether he was able to concentrate, whether he was able to follow the instructions, a number of things that over the course of even several hours I think that anybody would notice and be able to comment upon. And I believe that the FCE issue, particularly when it finally occurred, is as noted in our briefs and I think as also noted by Judge Snyder in the district court, is somewhat of a red herring or is irrelevant. As Judge Clifton mentioned earlier, this is a case that's under de novo review, and one of the issues there, of course, is the burden of proof and where that comes from. The district court properly and correctly realized that on the termination of disability benefits, citing several cases which are on our brief from outside of the Ninth Circuit, appellate court cases and district courts within the Ninth Circuit, that particularly in this situation where the policy or the plan provides that the insured has to provide continuing proof of disability, that the burden remains on the claimant during the claim and on the plaintiff during litigation to prove that he qualifies for disability benefits. I believe that Judge Snyder's opinion, district court's opinion, clearly indicated that while she considered the FCE, that without the FCE, had it not been ordered, she would not have been able to find that the plaintiff had met his burden of proof. Had she been able to find that based on the record that she had, she would not have needed the FCE. Had the plaintiff reached his burden of proof during trial, anything, nothing else would have mattered. The FCE could only have helped the plaintiff in this situation. It could not have done anything different because it was his burden of proof to reach there. I understand the theory of that. I'm not sure in practice. If a court's wobbling, it may be able to find 5149, but it knows it's 5149. So it wouldn't seem unusual for a district court to request additional information, and arguably through misunderstanding or miscommunication, she thought she had a green light that the plaintiff says he didn't mean to give, goes forward, and whether you call it tipping the balance or confirming her previous impression, it might have been 5149 in favor of plaintiff before, and now she says, oops, well, no, I'm falling back to 60-40 the other way. So I hear what you're saying, but I'm not sure in practical terms that we can really say without the FCE, we're confident that the district court would have found against plaintiff's claim. Just an observation. Comment as you see fit. With 20-20 hindsight, it would be difficult to understand to see what Judge Schneider would have done had she not had it. I believe that both in her trial decision and the findings of fact and conclusions of law, and I think, again, when the motion for new trial was made, that she made it fairly clear that it was just an extra piece and that based on the other information, looking at the plaintiff's medical records, looking at the submissions that were made, looking at the evaluations that Connecticut General made, that she could still not find that he had reached the burden of proof that he could show that he was disabled. On the issue of the full and fair review, I also want to respond to plaintiff's comments that there was not a full and fair review due to the lack of a medical professional and being involved in the second administrative appeal. I would submit that there was not actually an official second appeal, although the company did decide to make the review. The initial appeal had occurred in January of 2007. Two or three weeks after that, Dr. Towner, plaintiff's physician, faxed directly to Connecticut General his report. That was on February 19. It was reviewed by a doctor during that time, an in-house doctor, Dr. Taylor, who conducted a full review, indicated what he saw and didn't see in the medical records. And then on March 7, 2007, the original denial or termination of benefits was upheld. It was only the following day, March 8, that plaintiff sent a letter to Connecticut General. That letter, this is at the record at 78 through 86, was directed at his confusion as to deadlines for his first appeal, when he could continue to submit information. Between that, he submitted those letters to show the confusion that he had, and then he submitted, once again, Dr. Towner's February 19 medical report. There was no mention in that letter anywhere for any reference to the first appeal, the decision on the first appeal, or even requesting a second appeal. However, in abundance of caution, Connecticut General then had a new claims examiner, so someone who was conducting a full and fair new review, and they spent the next three months. And then in June of 2007, they upheld the decision again. So that is how that played out. So there was no need. There were no new records. There was no new evidence. There wasn't an actual appeal that was submitted with suggesting that something should be looked at differently than the first appeal was. The issue also, of course, arises on the burden of proof and on de novo review, whether or not the full and fair review becomes relevant. As indicated, the court is doing an independent review. I think the Seventh Circuit, I think it's in Judge Easterbrook and Diaz vs. Prudential Insurance. This is not in our briefs. It's 499F3640, mentions that perhaps a de novo review is a misnomer, and that at least the attorney should come up with a new way of looking at it, because it's not a review of anybody's decision. It is the court, in a sense, placing itself in the shoes of the claims administrator, looking at the file in its entirety and reaching its own decision. As there's no deference, as how the claim was handled by the insurance company is irrelevant under that situation, full and fair review wouldn't have an effect on the court's decision or on how this court reviews the district court's decision. Unless there are any specific questions from the panel, I would submit at this point. Thank you for your argument. Thank you. Thank you, Your Honor. You know, the judge told us, the district judge told us exactly what she based her decision on at the end there. She said she based it on the functional capacity evaluation and reliance on the defendant's people's review of the plaintiff's evidence and Dr. Towner's evidence. And if she was doing a de novo review, she wasn't supposed to rely on their view of the evidence. She was supposed to make her own independent review of the evidence. And if she had made her own independent review of the evidence and decided that Dr. Towner was not to believe because there was no evidence of wasting and he was claiming wasting, she would have been wrong. As a matter of law, she would have been wrong because Dr. Towner mentions wasting. Admittedly, he doesn't have it throughout his records, but he's giving this man anti-wasting testosterone medication throughout the entire treatment. The records are full of this medication. So she would have been wrong there. If she had said that I based it on the functional capacity evaluation and the expert's opinion in that evaluation, she would have been wrong because that man, that expert, who saw my client for, I think, four hours total, said, I don't know what his condition was before, I can't even give an opinion on that, or what it's going to be after. Today he can work. Okay? It was limited to a snapshot of that day. So she would have been wrong if she had based it on that. As far as the burden of proof issue goes, my client had been receiving the benefits under that test for, I think, 14 and a half years. It's the same evidence they had in front of them from Dr. Towner that they had from the prior doctor. Doctor, I think his, Deweyka was his name. Well, but in a practical matter, it wasn't, because at the time of the first benefit decision, quote, everybody thought that AIDS was a death sentence, and a very near-term death sentence. And it turns out Magic Johnson is still living 15 years later. And fortunately, your client is still living. But we can't say that circumstances haven't changed. So it's not surprising that, gee, all these people that were supposed to be dead are still living. Maybe we better take another look at this. It isn't surprising. I'm not saying that the result is necessarily justified. But take a step back. I can't say that I'm surprised by the review. Okay.  And, in fact, that was not the argument until the Jenkins case came out and counsel cited it in his brief. We never had an opportunity to put on evidence that, first of all, Mr. Munez had HIV infection for about, I think it was 16 years before it was ever discovered, or 10 years, some long time before it was discovered. The Jenkins case talks about a man of 20. It cites two newspaper articles about if a man of 20 is discovered with AIDS today and given the medication, he can live to 70-something. Okay. Well, Mr. Munez was not diagnosed with HIV when he was infected. He wasn't diagnosed until years later. And at that time, he was not 20 years old, and the level of treatment wasn't at the level it is today. So he's a guy. He doesn't even fit into that example. But the main thing is we were never given an opportunity to put on any evidence of this, and certainly not the Magic Johnson, who was in tip-top physical condition and had the absolute Cadillac of care, and who was also discovered with the HIV infection after Mr. Munez and when the level of care had been better than his. If you know about HIV infection and AIDS, it starts neurological damage that is never repaired, and that neurological damage in Mr. Munez has been going on for years before he ever got to this level, the level of care that we have today. So he was receiving a lower level. So we never got to put on any evidence of that at all because that was never an issue. That didn't become an issue until Jenkins came along. I don't know if I made the point, but if, as the judge, if the judge relied on the review of the plaintiff's evidence made by the defense, she has violated one of the basic rules of the NOVA review because you're not supposed to take into account their ‑‑ So the judge is not supposed to look at the record and say, you know, this is the record that you have to review. She also ‑‑ This is wrapping up rebuttal. We've heard these arguments. Anything you must say in the next ten seconds. Well, just at the second appeal, it's pretty obvious. The regulations say that you must have a doctor ‑‑ when there's medical evidence in question, you must have a doctor specialized in that area review the records. And it must be a doctor that did not see it the first time. The second review, they didn't have any doctor at all review the records. And I think that a full and fair review applies both to de novo review, regardless of whether there's de novo review or abuse of discretion review. Thank you. We thank you. We thank both counsel for the argument. The case just argued is submitted. That concludes our calendar for today. We're adjourned. Thank you.
judges: Noonan, Clifton, Bybee